[Civ. No. 1507. Fourth Appellate District.—December 14, 1934.]

JOSEPHINE FARRAR, Appellant, v. POLICY HOLDERS LIFE INSURANCE ASSOCIATION (a Corporation), Respondent.

88

Chas. D. Swanner for Appellant.

Charles D. Warner, Thomas W. Hughes, Lawrence E. Drumm and Milburn Harvey for Respondent.

MARKS, J.—Plaintiff is the widow of Joseph Carter Farrar who died on January 30, 1933. He carried an insurance policy on his life, dated February 20, 1929. It was issued by defendant with plaintiff named as beneficiary. She furnished the necessary proofs of death but payment was refused because of statements made in the application for the insurance which defendant maintained were false, and knowingly and fraudulently made by deceased.

The defendant did not require any physical examination of its policy holders, the insurance being issued upon the statements made in the application signed by the insured.

In the application made by deceased we find the following: "From what illness have you suffered in the past two

years? None. Are you now in good health? Yes. . . . Have you knowledge that any physical or mental disease exists in your system? No. . . . I am of the Caucasian race, in good health, and so far as I know have no disease or other conditions which would prevent me from obtaining life insurance. I agree to the terms, conditions and provisions of the Certificate of Membership, that this application becomes a part of such Certificate and that any false statement, misrepresentation or concealment of any material fact on my part shall make void my membership.''

The policy contained the following paragraph: ''A false statement, misrepresentation or concealment of any material fact in the application for membership, shall make void this certificate and shall bar the right of any beneficiary to collect any sum hereunder. In the absence of fraud, this certificate shall be incontestable and free from all conditions as to residence, travel, place or manner of death, except that suicide while either sane or insane, within one year from date of issue, shall limit the amount payable hereunder to the total amount paid hereon by the member, and no more.''

On the issue of fraud the trial court found as follows: ''That it is true that the answers so made by the said Joseph Carter Farrar to the above-mentioned questions propounded to him at the time of his application for membership in the defendant association were false and wilfully false when made and were known to be false by the said Joseph Carter Farrar in that the said Joseph Carter Farrar at the precise time of making said application and during the two-year period immediately preceding the date of making said application, to-wit: February 20, 1929, was suffering and had suffered from certain heart diseases prior thereto during the two-year period immediately preceding the date of the application and that it is true that at that precise date of making said application, to-wit: February 20, 1929, the said Joseph Carter Farrar was not in good health and knew that he was not in good health; and that it is true that said Joseph Carter Farrar had then existing in his system and knew that he had existing in his system certain physical diseases, to-wit: myocarditis and heart disease, and at that time was suffering from the following diseases, to-wit: myocarditis, heart disease, impairment of the vision, rheumatism and arteriosclerosis.'' It was fur-

ther found that defendant relied upon these false representations in issuing its policy and had no notice or knowledge of their falsity until after the death of the insured.

It should be observed that the only ailment which the trial court found to be known to deceased at the time he made his application was "myocarditis and heart disease". The other diseases mentioned in the quoted finding become entirely immaterial if they were not known to the insured at the time he signed the application, as it had been held that similar statements made in an application for insurance to the same defendant company were not warranties because of the limited or qualified expressions contained in the application as to the knowledge of the insured concerning the condition of health. (*Adams* v. *Policy Holders Life Ins. Assn.*, 126 Cal. App. 535 [14 Pac. (2d) 775]. See, also, *National Bank of D. O. Mills & Co.* v. *Union Ins. Co.*, 88 Cal. 497 [26 Pac. 509, 22 Am. St. Rep. 324]; *O'Connor* v. *Grand Lodge A. O. U. W.*, 146 Cal. 484 [80 Pac. 688]; *Chase* v. *Sunset Mutual Life Assn.*, 101 Cal. App. 625 [281 Pac. 1054].)

The evidence before us shows that Joseph Carter Farrar was a veteran of the Spanish-American War. On April 20, 1923, he made his first application for a pension because of physical disabilities among which he specified that his heart was affected. His physical examination occurred on June 13, 1923, the examiners reporting they found him suffering from myocarditis and mitral regurgitation. His application was disallowed in Washington. This was followed by another which was allowed. This application and his applications for increases of pension were made on the following dates: May 21, 1924; November 24, 1925; October 28, 1927; and February 11, 1930. In each application deceased stated, as one of the reasons for the pension or its increase, that he had heart trouble or that his heart was affected. Medical examinations were had on the following dates with the pertinent findings of the examining board set out after each date: February 27, 1924, heart normal; October 24, 1924, myocarditis, no murmurs; June 27, 1926, myocarditis; November 23, 1927, "Cardio-Vascular System: Normal? no. Man has a systolic murmur heard loudest at apex, but not transmitted, area of dullness, 20 per cent increased. . . . Man has a bad heart." The physician who

examined him on March 13 or 14, 1930, testified in part as follows: "I examined him and rated him 'total disability'; . . . He had a heart enlarged three quarters of an inch beyond the right side of the sternum." Deceased was allowed a pension and increases of pension and was finally given a three-fourths disability rating. This was prior to his application for insurance.

Deceased died following an operation for the removal of a tumor from his brain. Physicians testifying for the defendant were of the opinion that the heart trouble hastened the growth of the tumor.

■ The evidence which we have referred to supports the finding that deceased was suffering from a serious heart ailment at and before the date upon which he made his application for insurance; that he knew of this trouble; that he concealed it from the insurance company and was knowingly untruthful in answering some of the questions in the application. Such concealment and misrepresentation furnishes sufficient grounds to void the policy. (Secs. 2561, 2562, 2563, Civ. Code; 14 Cal. Jur. 486 et seq.)

Plaintiff produced numerous witnesses the effect of whose testimony was to rebut the defendant's evidence that deceased had a diseased heart and knew it when he signed the application for insurance. This merely created a conflict in the evidence which the trial court resolved against her. This becomes binding on us under the facts here presented.

Plaintiff has cited numerous cases where the defense of wilful concealment of a material fact by the insured was urged as a defense by the insurer and judgments for the plaintiffs were affirmed. In each of these cases the trial court found the facts in favor of the beneficiary and against the insurance company. As we have here the reverse of such a situation the cited cases furnish us with no authority for disturbing this finding and the judgment of the trial court.

■ Plaintiff maintains that the trial court found deceased was suffering from a heart affliction at the time of the application for insurance, while the diseases alleged in the answer were those pertaining to the brain and other organs distinct from the heart. This amounts to a claim that there was a variance between the pleadings and the

proof, and the pleadings and the findings of fact. No objection to any evidence on the ground of such variance was made in the trial court. This objection cannot be urged here for the first time. Furthermore, we believe that the allegations of paragraph two of the separate and second affirmative defense are sufficiently broad to permit the introduction of the evidence had such an objection been made in the trial court.

█ Plaintiff contends that defendant waived the falsity of the answers in the application; also, that it is estopped from relying upon the fact of the untrue statements having been made because of not having promptly rescinded the contract after having gained knowledge of the true facts. (Sec. 2564, Civ. Code.)

Plaintiff testified that in a conversation had with the president and secretary of defendant on the day the application was signed she informed them that her husband was a disabled Spanish-American War veteran and was receiving a disability pension from the government. The president of the company denied that any such conversation took place. This again brings us back to the familiar rule that conflicts in the evidence are settled in the trial court.

There is also evidence in the record that deceased was appointed a soliciting agent of defendant; that he with another such agent solicited disabled members of a camp of Spanish-American War veterans for insurance; that several were insured; that prior to the death of deceased plaintiff and a disabled veteran policy holder interviewed the president of defendant and informed him that the policy holder was a disabled veteran drawing a disability pension and asked if such fact would invalidate an insurance policy; that the president replied: "I told them that we didn't ask the question in our application whether they received a pension; that any policyholder with us that answered the questions propounded in our application, and that if they answered those questions truthfully, they had nothing to worry about. That was my answer to Mrs. Farrar and the gentleman accompanying her, and my answer to everyone making a similar inquiry." The president also testified that numerous other questions similar in form were asked of him by other policy holders and like answers given by him.

■ The law imposes upon the insured the duty of dealing honestly with the insurer. It is equally emphatic in requiring like honesty on the part of the insurer in its dealings with the insured and the beneficiary. Dishonesty on the part of either is frowned upon and appropriate penalties provided.

In 14 Ruling Case Law, at pages 1166 and 1181, it is said: "The law is charitable enough to assume, in the absence of any showing to the contrary, that an insurance company intends to execute a valid contract in return for the premiums received; and when the policy contains a condition which renders it void at its inception, and this result is known to the insurer, it will be presumed to have intended to waive the condition, and to execute a binding contract, rather than to have deceived the insured . . . , and to have taken his money without consideration. . . . Waiver of a forfeiture though in the nature of an estoppel may be created by acts, conduct, or declarations insufficient to create a technical estoppel, and the courts, not favoring forfeitures, are inclined to grasp any circumstances which indicate an election to waive a forfeiture. Any acts, declarations, or course of dealing by an insurer, with knowledge of facts constituting a breach of a condition in a policy, leading the person insured honestly to think if conforming thereto a forfeiture of his policy will not be incurred, followed by due conformity on his part, estops the insurer from insisting on the forfeiture."

In *West Coast Lumber Co.* v. *State etc. Co.*, 98 Cal. 502 [33 Pac. 258], it is said: "If, as was the case here, a building is insured against loss by fire under a policy containing a proviso that it shall be or become void in case the building is or shall become vacant or unoccupied, when, as was well known to the insurer at the date of the policy and subsequently, it was and remained unoccupied, the insurer will be presumed to have waived the clause as to occupancy. May on Insurance states it in this wise: 'To deliver a policy with full knowledge of facts upon which its validity may be disputed, and then to insist upon these facts as ground for avoidance, is to attempt a fraud. This the courts will neither aid nor presume; and when the alternative is to find this or to find that, in accordance with honesty, there was an intent to waive the known ground

of avoidance, they will choose the latter.' (May on Insurance, sec. 497; *Commercial Ins. Co.* v. *Ives*, 56 Ill. 402.)''

In *Steil* v. *Sun Insurance Office*, 171 Cal. 795 [155 Pac. 72], it is said: ''It is stated in the briefs that the instructions were based on a passage from Cooley's Briefs on Insurance (vol. 3, p. 2665) regarding 'the effect of an insurer's failure to act on obtaining knowledge of facts which either avoid or forfeit a policy,' and saying: 'The weight of authority supports the proposition that an insurance company waives or is estopped to assert a violation of the terms of an insurance contract if the company, on being notified of the violation, remains silent and fails to .object or to declare a forfeiture, or cancel or rescind the contract, within a reasonable time. This rule is no doubt in most cases based on the theory that it is a .breach of good faith on the part of an insurance company to remain silent and inactive on notice of a breach, and to retain the unearned premiums, and so lead the insured to believe that his insurance contract is regarded as valid notwithstanding the breach.' This rule is doubtless applicable in all cases where the facts brought to the insurer's knowledge show some violation of the terms of the policy, which, either by law or because of some provision of the policy itself, operates to avoid or forfeit the policy.'' (See, also, *Murray* v. *Home Benefit Life Assn.*, 90 Cal. 402 [27 Pac. 309, 25 Am. St. Rep. 133]; *Baylcy* v. *Employers' Liability Assur. Corp.*, 125 Cal. 345 [58 Pac. 7]; *J. Frank & Co.* v. *New Amsterdam Casualty Co.*, 175 Cal. 293 [165 Pac. 927]; *MacGruer* v. *Fidelity & Casualty Co.*, 89 Cal. App. 227 [264 Pac. 501].)

It appears in the record in this case, that at the time deceased applied for his insurance and the policy was written and delivered, the federal laws required as a prerequisite to granting a pension to a Spanish-American War veteran that such veteran be suffering from some physical disability to such an extent that it reduced his earning capacity and interfered with his ability to earn a living. Of course the loss of a lcg or an arm would produce such a result but such disability would be plainly visible. There is no suggestion that deceased had any visible disability. The conclusion must follow that a person knowing of the physical disability of deceased must have known that it resulted from the impairment of functions of some invisible organ

or portion of the body. Such impairments result from disease or the ravages of time. Deceased was nearly fifty years of age when he applied for insurance. The officers of defendant knew before he died that he was drawing a disability pension. They had seen deceased and had personally taken his application. They were charged with the knowledge that he was suffering from some physical ailment which reduced his earning capacity. They did not act promptly and did not cancel his policy upon receipt of the knowledge of his disability but reserved this defense until after he had died and his widow brought suit to recover the value of the policy.

A study of the record leaves us with the conclusion that the results shown in this case might easily have been the product of a deliberate plan on the part of the officers of the defendant company to enrich the company and defraud the class of insured to which deceased belonged. They sought to insure veterans of the Spanish-American War who were drawing disability pensions. These men had all passed well into and some of them beyond middle age. They were all suffering from physical disabilities to some extent. The evidence shows that these disabilities, including those from which deceased suffered at the date of his application, were often the results of age alone. Defendant required no medical examinations even though its officers knew that these insured were physically disabled. Defendant required the insured to certify that they were in good health when its officers knew they were not. When, on account of a certain happening, a number of the insured became alarmed about the validity of their policies and sought information on this question, the president of defendant gave the questionable, equivocal and misleading answer we have quoted. If the answer had been deliberately planned for the specific purpose of lulling the fears of the unwary, and at the same time attempting to save to the defendant the specific defenses it is urging in this action, it is difficult to see how it could have been more cleverly worded.

A study of the record before us leaves us with the definite conclusion that while the deceased was knowingly untruthful in answering the quoted questions in his application for insurance, the defendant was also culpable in permitting the policy to remain in force and in not rescinding the policy promptly after it had knowledge that deceased was disabled.

■ J. M. Pearson, a disabled Spanish-American War veteran, testified that he was drawing a disability pension from the government; that he was insured by defendant; that another pensioner, a disabled Spanish-American War veteran, insured by defendant died; that payment on the policy was refused by defendant; that this happening alarmed the witness and his wife about the insurance and that they went to the general offices of the defendant in November, 1931, and interviewed its secretary; that the witness informed the secretary that he was a disabled Spanish-American War veteran drawing a disability pension and inquired about the effect of such disability on his insurance, that an answer was given by the secretary in effect somewhat similar to the quoted answer of the president. This testimony was corroborated by Mrs. Pearson, except that she testified that the secretary told her husband that the fact of the pension would have absolutely no effect on the policy of insurance; that the secretary was also a Spanish-American War veteran drawing a pension and was a policy holder in defendant; that the company had insured hundreds of Spanish-American War veterans. An offer was made to prove that the substance of this conversation had been communicated to Mr. and Mrs. Farrar.

The evidence of these two witnesses was erroneously stricken from the record. It had an important bearing on the policy of defendant in insuring disabled Spanish-American War veterans who were pensioners and the waiver of their disabilities. It should have remained in the record and should have been considered by the trial judge in deciding the question of the waiver by defendant of the falsity of the statements in the application for the insurance signed by deceased.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 11, 1935.